IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

BERNETHIA JOHNSON,                    )
                                       )        2007 JAN 18  P 2: 29
        Plaintiff,                     )
                                       )        DEBRA P. HACKETT CLK
                                       )        U.S. DISTRICT COURT
v.                                     )        CASE NO: 2:07CV59 - m
                                       )
JO ANN B. BARNHART,                    )
Commissioner,                          )        JURY DEMAND
                                       )
SOCIAL SECURITY                        )
ADMINISTRATION,                        )
                                       )
        Defendants.                    )

## COMPLAINT

**COMES NOW** Bernethia Johnson, and for her complaint against Defendants and their agents and representatives (Defendants) hereby complains as set forth herein below.

## JURISDICTION

1.    This Court has jurisdiction over the litigation herein pursuant to 28 U.S.C. § 1331 and 1343, Retaliation, and Hostile Work Environment.

2.    Plaintiff has fulfilled all conditions precedent to the institution of this action.

## VENUE

3.    Defendants are located and/or doing business within this judicial district (Middle District and the Northern Division of Alabama).  This

1

action is brought within the judicial district wherein the unlawful employment practices were committed, making venue proper under 28 U.S.C. Section 1391(b), Retaliation and Hostile Work Environment.

## PARTIES

4.     Plaintiff Bernethia Johnson, hereinafter referred to as "Plaintiff," is an African-American female resident of the United States, residing in Nashville, Tennessee.

5.     Defendant Jo Ann Barnhart, hereinafter referred to as "Commissioner" is the Commissioner for the Social Security Administration.

6.     Defendant, Social Security Administration, hereinafter referred to as "Agency/Management" is a federal agency and is authorized to do business in the State of Alabama, and employs at least fifteen (15) persons and otherwise meets the jurisdictional prerequisites of Title VII.

## FACTUAL BACKGROUND

7.     Plaintiff first began working for Defendants on or about September 26, 1993, in the Hearings and Appeals (OHA) division in Montgomery, Alabama as a Hearing's Office Clerk.

8.     Paul Reams is a member of management and was aware of Plaintiff's participation in statutorily protected activity.

9.      Cynthia Lamar is a member of management and was aware of

2

Plaintiff's participation in statutorily protected activity.

10.  Plaintiff filed her first EEO complaint in 1997.

11.  On or about May 14, 2003, Plaintiff initiated her second EEOC action for non-selection.

12.  November 14, 2003, Mr. Reams denied Plaintiff 1 hour leave to vote.  The Agency had always allowed its employees at least one hour leave to vote.

13.  On July 21, 2004, Plaintiff found two time sheets of other employees – Teresa Weeks and Beverly Warner – in her work documents while she was working at home on alternate duty station.  Plaintiff believes that she was being framed, as time sheets are always kept in a three (3) ring binder, which must be opened to remove the sheets.  In other words, someone had to deliberately remove the documents from the three ring binder and place them within Plaintiff's work documents.  Plaintiff informed management in the presence of the union steward, Lynda Tamplin, that the time sheets mysteriously appeared in her work documents.

14.  On or about July 30, 2004, Plaintiff filed a formal complaint of discrimination and retaliation.

15.  October 7, 2004, Mr. Reams denied Plaintiff's hardship transfer request to Birmingham, AL.

16.  November 5, 2004, Cynthia Lamar, supervisor, conducted a pre-hearing and post-hearing audit of the files assigned to Plaintiff that

3

were located in the file cabinets near the receptionist's area. The audit also included those files that were on Plaintiff's desk and in a cart. As Ms. Lamar conducted the audit, Ms. Lamar threw Plaintiff's assigned cases on the floor. The Plaintiff expressed to Ms. Lamar that it was embarrassing to have the files thrown on the floor and suggested that there was a better way of conducting the audit. Plaintiff further informed Ms. Lamar that she had many years in the logistics field and could show her another way to conduct the audit. After making this statement, Ms. Lamar grabbed Plaintiff's upper left arm. Plaintiff asked Ms. Lamar to release her arm. Afterwhich, Ms. Lamar left Plaintiff's area.

17.    At the beginning of the audit, Plaintiff was writing the status of the files and Ms. Lamar assured Plaintiff that there was no need to duplicate the effort, because Ms. Lamar would give Plaintiff a copy of her report, which included the location of the cases. Plaintiff believed Ms. Lamar and stopped recording the status. After the completion of the audit, Ms. Lamar requested that Plaintiff tell her the location of each of the files that had just been audited. Ms. Lamar refused to give Plaintiff a copy of the report.

18.    November 9, 2004, Plaintiff responded to Ms. Lamar's November 5, 2004, audit request.

19.    November 10 through November 16, 2004, Plaintiff emailed correspondence referencing being subjected to a hostile workplace.

Plaintiff hand delivered a letter to Mr. Reams with a follow-up email dated November 15, 2004.

20.     January 27, 2005, Mr. Reams approached Plaintiff's work area in an irate manner demanding that Plaintiff move her vehicle from a handicap parking space.   Since the office had moved into the building in 2000, non-handicapped employees had always parked in any of the five handicap spaces.   It was brought to Plaintiff's attention that she was the only employee who had been asked to move her vehicle and all other bargaining union employees who were white were allowed to remain in the other handicap spaces. Shortly afterwards, Ms. Lamar issued an email only to group B that, "if you have not been issued a handicap placard, you are not authorized to park in OHA parking spaces designated for the disabled."

21.     January 28, 2005, as Plaintiff parked her vehicle in the employees' parking lot, Plaintiff noticed that white non-handicap bargaining union employees were parked in the handicap parking spaces. Plaintiff informed the union steward, Ms. Tamplin, who asked Mr. Reams why the other employees were allowed to park in the handicap parking spaces and Plaintiff was not.   As a result, Mr. Reams removed three of the handicap signs that were affixed to the office building.

22.     January 29, 2005, Mr. Reams followed up with an email to all

employees.

23.     February 2, 2005, while waiting to get approved for a hardship
        transfer, the following vacancy announcements were announced:

        OHA 59-2005 2-4-05 Chattanooga, TN Legal Assistant

        OHA 63-2005 2-17-05 Atlanta (North), GA Legal Assistant

        OHA 119-2005 7-14-05 Atlanta (Downtown) GA Legal Assistant

        Notwithstanding Plaintiff's request, Plaintiff's hardship transfer
        request, Plaintiff was not offered one of the vacancies.

24.     February 23, 2005, a car that Plaintiff purchased on February 19,
        2005, for Plaintiff's college-aged daughter was keyed on
        government property.  Plaintiff contacted the police and informed
        Mr. Reams by email.  Plaintiff requested that the Agency pay to
        have the vehicle repaired.

25.     April 4, 2005, Plaintiff was summoned to Ms. Lamar's office.  Ms.
        Brenda McAnally was present.  Plaintiff requested that Ms. Lamar
        call Lynda Tamplin, union steward.  Initially Plaintiff was denied, but
        was eventually allowed to call the union representative.  Ms. Lamar
        gave Plaintiff a box that contained some closed cases and
        correspondence that was supposed to have been mailed to
        Plaintiff.  In the box were two sheets of paper with Tammy Martin
        and Paula Jackson's names written on them.  Ms. Lamar refused to
        allow Plaintiff to copy or read the information on the documents.
        Ms. Lamar had Mrs. McAnally read the information to Plaintiff, as

though Plaintiff was not capable of reading for herself. This was extremely degrading, belittling and tremendously humiliating to Plaintiff.

26.    April 11, 2005, a claimant's case (Ms. Ward – Claimant) was returned to Plaintiff by Ms. Lamar. Per a former supervisor for completion of development, consistent with Judge Thigpen's instructions issued on October 14, 2004, this same case had advanced to the next level.

27.    May 10, 2005, an unfavorable judgment was rendered, regarding EEOC Number 130-2005-00007X and Agency Number 03-375.

28.    June 3, 2005, while standing in the doorway of Mr. Reams' office, Plaintiff was discussing some general concerns with Mr. Reams. Plaintiff then entered Mr. Reams' office and shut the door behind her so that she could discuss a personal matter with Mr. Reams. Upon shutting the door, Mr. Reams exclaimed, "Open the door! Open the door!" Plaintiff instanteously opened the door and asked curiously, "What's wrong Paul?" Mr. Reams responded that Plaintiff might do something to him and that Plaintiff was not to come into his office without a witness. Plaintiff was stunned. Plaintiff replied, "Paul don't make me out to be something I am not." Plaintiff left out of Mr. Reams' office and returned with Ms. Lynda Tamplin, union steward. Plaintiff informed Ms. Tamplin in front of Mr. Reams that Mr. Reams requested that she (Plaintiff) not come into his office

without a witness. Plaintiff's concern was addressed followed by a verbal request by Plaintiff to allow Plaintiff to transfer to another office. Mr. Reams stated that it depended on what Plaintiff's request contained. Mr. Reams stated that if the request showed that he (Mr. Reams) was the reason for the transfer, he would not approve it.

29.   June 7, 2005, Ms. Ward's case was reassigned to Plaintiff for further development. Ms. Lamar emailed Plaintiff stating, "After full review of the file, I see no indication that the mental RFC requested was secured or ever ordered." When Plaintiff received the file, Plaintiff thoroughly reviewed the file and afterwards, requested that other employees review the file to determine if they could understand Ms. Lamar's request. Since no one seemed to understand Ms. Lamar's request, Plaintiff went to Ms. Lamar's office to further discuss the case. Plaintiff knocked on Ms. Lamar's door to secure permission to enter. Plaintiff then entered and shut the door behind her. Ms. Lamar asked Plaintiff if the door was locked. Ms. Lamar then went to the door and opened it. As Ms. Lamar was walking back to her desk, Plaintiff remembered the June 3, 2005, incident with Mr. Reams. Plaintiff inquired as to why Ms. Lamar had a problem with her closing the door. Plaintiff and Ms. Lamar discussed the case and Ms. Lamar instructed Plaintiff to leave the case with her because, she said that she really didn't look

at the case.  Gathering the file, Plaintiff said, "Let me make a copy of this and I will get it to you."  It appeared that Ms. Lamar had become angry and showed dissatisfaction with Plaintiff's statement. In a displeased voice, Ms. Lamar stated, "make a copy, make a copy, that's just a waste of time."  Ms. Lamar is generally a low toned individual.  Ms. Lamar's voice was clearly elevated and her tone was angry.  When Plaintiff heard the anger in Ms. Lamar's voice and observed Ms. Lamar push back from her desk, Plaintiff quickly walked out of Ms. Lamar's office carrying claimant's file with her.  To the best of Plaintiff's knowledge, with the exception of the one time Ms. Lamar distributed reports and stood outside of the entrance of Plaintiff's cubicle to give Plaintiff her reports, that was the last time Ms. Lamar came to Plaintiff's cubicle.  Ms. Lamar began to deliver paperwork to Plaintiff from across the empty cubicle next to Plaintiff. Plaintiff corresponded with Ms. Lamar via email, because Plaintiff recalled the November 5, 2004, physical abuse by Ms. Lamar.  Via email, Plaintiff informed Ms. Lamar that Ms. Ward's case had been placed on the table located in the receptionist's area.

30.    June 9, 2005, Plaintiff gave Ms. Lamar an updated status of Ms. Ward's case via email.  The email stated that, "Dr. Sack, has completed the interrogatory."   Ms. Lamar stated that, "the interrogatory should have gone to a vocational expert instead of a

psychological expert.    Nonetheless, the evidence has been proffered to the attorney."    Plaintiff also received an email summoning her to a Weingarten meeting with Ms. Lamar.

31.    June 13, 2005, Plaintiff received a Proposal to Suspend from Ms. Lamar alleging that Plaintiff made "an offensive hand gesture" to her (Ms. Lamar) on June 7, 2005.  Upon asking both members of management, Ms. Lamar and Mr. Reams, to demonstrate the hand gesture, they both refused.

32.    June 16, 2005, Plaintiff responded to the Proposal to Suspend.

33.    June 21, 2005, Plaintiff was issued a Decision to Suspend from Mr. Paul Reams.

34.    June 28, 2005, Plaintiff responded to a note from Ms. Lamar instructing Plaintiff to, "Correct the T&A roster & your SSA-71 to reflect 4 ½ hours leave for 6-27."    Ms. Lamar in turn accused Plaintiff of lying about the time Plaintiff signed into the office on June 27, 2005.  Ms. Lamar stated that Plaintiff got into the office later than the time Plaintiff recorded on her time and attendance sheet.    Ms. Lamar stated that Plaintiff arrived after 10:00 a.m. Plaintiff maintained that her arrival was approximately 9:50. Plaintiff had a witness to the time of her arrival.

35.    June 29, 2005, Plaintiff submitted a request for an immediate transfer to Mr. Reams.

36.    July 1, 2005, Ms. Lynda Tamplin corroborated the witness' statement regarding Plaintiff's approximate arrival time.

37.    July 15, 2005, Plaintiff set off the alarm in the office, because she went to the bathroom before leaving the office for the day.  Usually Ms. Laura Robinson and Ms. Chevalier remain in the office well after the office has closed.   Periodically, Mrs. Renita Barnett-Jefferson, staff attorney, would remain at the office after 6:00 p.m. Nevertheless, when Plaintiff came out of the bathroom, she was unable to get out of the building. Plaintiff returned to her desk to make a telephone call to Mr. Reams, but saw Mr. Reams exiting the employee's driveway.   Mr. Reams evidently spotted Plaintiff's vehicle parked next door and returned to the office.    Plaintiff explained to Mr. Reams about her having to go the restroom.

38.    July 18, 2005, Mr. Reams emailed the employees about the 6:00 p.m. closing, informing them that, "Yesterday, our alarm was set off by an employee who was still in the building at 6:15."  It was no secret that Plaintiff was the employee that Mr. Reams was referring to.  Plaintiff was very embarrassed.

39.    July 18, 2005, Plaintiff responded to Mr. Reams' embarrassing email.  Plaintiff reiterated her reason for being in the building after closing.

40.   July 22, 2005, Plaintiff emailed Mr. Reams about the challenge she was faced with regard to the placement of files in light of Plaintiff not being able to come into his office.

41.   July 23, 2005, Plaintiff sent an email to Mr. Jacy A Thurmond requesting an appointment by telephone between July 25, 2005, and July 28, 2005.  Mr. Thurmond's office contacted Plaintiff while she was on suspension.

42.   July 25, 2005, through July 28, 2005, Plaintiff was suspended from work.  This action (suspension) was displayed on Plaintiff's leave and earnings statement for many months.

43.   August 10, 2005, Plaintiff was summoned into Mr. Reams' office. Plaintiff was accompanied by Ms. Tamplin, union steward.   Mr. Reams stated that Chattanooga, Tennessee did not want Plaintiff. Plaintiff responded to an August 2, 2005, letter from Mr. Bozeman regarding Plaintiff's transfer.   Since Mr. Reams had just informed Plaintiff that Chattanooga did not want her, Plaintiff listed 11 other hearing offices located in six different states to be considered in allowing Plaintiff to transfer.

44.   September 1, 2005, after almost a year, Plaintiff was finally transferred to the Chattanooga, TN office.

45.   September 2, 2005, as Plaintiff was walking from her car to the office building she was almost hit by a vehicle on government property.  The vehicle was driven by Renita Barnett-Jefferson.  Ms.

Barnett-Jefferson told Plaintiff in front of the security guard, Mr. Marick Robinson, "I don't know if you have ever driven a stick shift before, but my foot got stuck on the accelerator." Ms. Barnett-Jefferson further stated that she immediately came into the office and reported the incident to Mr. Reams. Mr. Reams never mentioned anything to Plaintiff about the incident, and Mr. Reams never conducted an investigation. However, Mr. Reams told Mr. Robinson that Plaintiff was, "on her way out of here."

46. Plaintiff filed a Federal Protective Service Field Interview Report – Number 00556. An investigator came and questioned Plaintiff. However, Plaintiff has not heard anything else from the investigator. Plaintiff also left messages with Mr. Hudson, former security guard, and superior to the security guard at that OHA Montgomery office. Again, Plaintiff has not heard anything from anyone.

47. September 9, 2005, Plaintiff filed an EEO complaint, case number 05-395.

48. October 3, 2005, Plaintiff transferred to the Office of Hearings and Appeals, Chattanooga, TN.

49. At all times material hereto, the Agency (Mr. Reams and Ms. Lamar) was aware of Plaintiff's participation in statutorily protected activity.

50.    This harassment and retaliation taken against Plaintiff were based on Plaintiff's participation in statutorily protected activities. Plaintiff was subjected to a continuing hostile work environment.

## COUNT ONE

## RETALIATION

51.    Plaintiff adopts, realleges and incorporates by reference paragraphs one through fifty, the same as if more fully set herein, and further alleges anew.

52.    In taking the above described actions, Defendants retaliated against Plaintiff, because Plaintiff filed a number of EEO complaints against Defendants, in particular, Defendants retaliated against Plaintiff in suspending Plaintiff from her GS-8 Legal Assistant position for three (3) days from July 25, 2005 through July 27, 2005, and when on June 28, 2005, Plaintiff was charged an additional ¼ hour leave for June 27, 2005.

53.    As a direct result of the ongoing retaliation against Plaintiff, Plaintiff's constitutional rights have been abridged.

54.    As a proximate cause of the Defendants' actions, Plaintiff has been injured and damaged, as set forth in paragraphs above. Plaintiff suffered loss of time toward her tenure, wages, embarrassment, benefits and considerable mental and emotional anguish.

## COUNT TWO

## HOSTILE WORK ENVIRONMENT

14

55.   Plaintiff adopts, realleges and incorporates by reference paragraphs one through fifty-four, the same as if more fully set herein, and further alleges anew.

56.   In taking the above described actions, Defendants created a hostile work environment beginning as early as the filing of her initial EEO complaint in 1997 to present.

57.   As a direct result of the ongoing hostile work environment based on race, Plaintiff's constitutional rights have been abridged.

58.   As a proximate cause of the Defendants' actions, Plaintiff has been injured and damaged, as set forth in paragraphs above.  Plaintiff suffered loss of time toward her tenure, wages, embarrassment, benefits and considerable mental and emotional anguish.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that this Honorable Court grant the following:

(a)   Assume jurisdiction over this action;

(b)   A judgment declaring that Defendants retaliated against Plaintiff and subjected Plaintiff to a Hostile Work Environment;

(d)   All backpay and fringe benefits as a result of the Retaliation and Hostile Work Environment, with interest;

(e)   Attorney's fees;

(f)   Costs;

(g)   Prejudgment interest;

15

(h)    An award of such compensatory damages for any loss of wages, and loss of benefits, including, but not limited to, retirement pension benefits, mental anguish, emotional distress, and embarrassment, both past, present and future to which Plaintiff may be entitled; and such further, other and different legal or equitable relief as the Court may deem appropriate or which she may be entitled, and

(i)    Punitive damages.

### Jury Demand

Plaintiff demands trial by jury on each and every cause of action.


Respectfully submitted,

_____
Juraldine Battle-Hodge (BAT033)


**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL CLAIMS SO TRIABLE.**

_____
**OF COUNSEL**


**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED**